**CLIFFS DRILLING COMPANY,**
Appellant,

v.

**Jimmy D. BURROWS, Appellee.**

No. 01–94–00672–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 8, 1996.

Rehearing Overruled Aug. 8, 1996.

Chris A. Lorenzen, Jr., Kathleen H. Alsina, Houston, for Appellant.

Alexander B. Klein, T. Bryan Akin, III, Houston, for Appellee.

Before TAFT, COHEN and MIRABAL, JJ.

## OPINION ON MOTION FOR REHEARING

TAFT, Justice.

We deny appellant's motion for rehearing, but withdraw our opinion of May 9, 1996, and issue this opinion in its stead.

This case requires application of the United States Supreme Court's recently formulated Jones Act [1] seaman status test. Appellee, Jimmy D. Burrows, worked as a welder aboard a jack-up drilling rig owned by appellant, Cliffs Drilling Company (Cliffs). Burrows claimed to be a Jones Act seaman when he slipped and fell; he sued Cliffs for negligence. The jury found in favor of Burrows and awarded him $506,000 in damages.

### Background

On July 3, 1991, Burrows contacted Dynamic Offshore Contractors (Dynamic) by telephone and applied for employment as a welder. Dynamic hired Burrows over the telephone and told him to go to Galveston and catch a crew boat to the Cliffs rig, the D/V MARLIN VI. Burrows had never before worked for Dynamic or Cliffs.

Cliffs was performing maintenance work on the rig to prepare it for an impending sale to Diamond M–Odeco. During normal operations, the MARLIN VI employed only one welder. Because of the extra work necessary to prepare the rig for sale, Cliffs hired extra contract welders, including Burrows, provided by Dynamic.

Burrows rode a crew boat out to meet the MARLIN VI on July 3, 1991, and was aboard for two days as the rig was towed from the Gulf of Mexico through the Sabine Pass. When the rig reached the Texas Drydock on July 5, 1991, it was positioned next to the bank, its legs were jacked down into the mud, and the rig was connected to shore

---

1. 46 U.S.C. App. § 688(a) (1986).

electrical power. A gangway provided access between the vessel and shore.

Burrows worked on the vessel at Texas Drydock until July 6, 1991, and was then off for two weeks. He returned to the vessel on July 20, 1991, and worked until July 25, 1991. After a two-day break, he returned to the vessel on July 27, 1991. After working two hours, he slipped and fell.

While working aboard the MARLIN VI, Burrows was under the supervision of Doc Carlisle, a Cliffs employee.[2] He also took all of his meals on the vessel and slept in the crew's quarters.

Burrows testified that when he accepted the job he did not know whether it would last for "two weeks or two months." Paul Vande Zande, the manager of offshore drilling for Cliffs, testified that the extra welders were needed to replace some rusted plate or piping on the MARLIN VI. Vande Zande estimated this work would take only three to five weeks to complete, and Cliffs never contemplated that any of the Dynamic welders would remain on the rig after the repairs were completed. When the extra work was completed, the welders were to be released back to Dynamic.

### Impact of New Seaman Definition

In points of error two and three, Cliffs contends the trial court erred by refusing to submit his proposed jury question and instruction on the issue of seaman status. Cliffs took issue with the adequacy of the trial court's definition of seaman taken from *Offshore Company v. Robison,* 266 F.2d 769 (5th Cir.1959).[3]

Under *Robison,* to qualify as a Jones Act seaman, an injured maritime worker must (1) be assigned permanently to a vessel or perform a substantial part of his work on a vessel, and (2) contribute to the function of the vessel or the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for future trips. *Id.* at 779. The district court's adherence to and application of the *Robison* test was generally accepted as correct at the time of its decision.

However, the subsequent decision on seaman status by the United States Supreme Court in *Chandris, Incorporated v. Latsis,* —— U.S. ——, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), supersedes the *Robison* test and makes it inapplicable to this case. Under *Chandris,* to qualify as a Jones Act seaman, a plaintiff must first show that his duties contributed to the function of the vessel or the accomplishment of its mission. —— U.S. at ——, 115 S.Ct. at 2190. Second, the plaintiff must have a connection to a vessel in navigation (or an identified group of vessels) that is substantial in terms of both its duration and nature. *Id.* The purpose of the second requirement is to separate seamen from "land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* The total circumstances of an individual's employment must be weighed to determine whether there is a "sufficient relation to the navigation of vessels and the perils attendant thereon." *Id.*

While the *Chandris* definition is similar to that of *Robison,* it differs significantly in its requirement of a substantial connection, in both duration and nature, to a vessel in navigation. Under *Robison,* performance of a substantial part of one's work on a vessel

---

2. The jury found that Burrows was a borrowed servant of Cliffs; this finding is not challenged on appeal.

3. The trial court charged the jury as follows:
  The Plaintiff is a seaman if he proves by a preponderance of the evidence that he performs the work of the vessel. He performs the work of the vessel if and only if:
    1. he was assigned permanently to a vessel *or performed a substantial part of his work* on a vessel; and

2. the capacity in which he was employed or the duties that he performed contributed to the function of a vessel or to the accomplishment of the vessel's mission or to the operation or maintenance of the vessel during its movement or while at anchor for the vessel's future trips. A person need not aid in the navigation of a vessel in order to qualify as a seaman. (Emphasis added).

was a sufficient connection. The difference in definitions is significant in this case because the primary issue was Burrows' connection to the vessel.

In this case, Burrows objected to the definition of seaman that the trial court included in the charge, and tendered the following instruction, which the trial court refused:

> To qualify as a "seaman" one must establish (1) that he was permanently assigned to or performed a substantial portion of his work aboard a vessel; and (2) the capacity in which he was employed or the duties that he performed contributed to the function of a vessel or to the accomplishment of the vessel's mission or to the operation or maintenance of the vessel during its movement or while at anchor for the vessel's future trips.
>
> ***The key to seaman status is employment-related connection to a vessel in navigation.*** A necessary element of the connection is that a seaman perform the work of a vessel.
>
> ***One is not a seaman if he comes aboard a vessel for an isolated piece of work. A person must demonstrate a significant part of his work was performed on the vessel with at least some degree of regularity and continuity,*** and his duties must have been more that merely fortuitous and incidental.

(Emphasis added).

Under *Chandris,* the jury question that the trial court submitted to the jury was erroneous because it did not require the jury to find that Burrows had a substantial connection to the MARLIN VI. For the same reason, the charge was defective because the trial court refused to submit Cliffs' requested question and instruction, which *did* require the jury to focus on Burrows' connection to the vessel. Accordingly, we sustain points of error two and three regarding jury charge error.

### Motions for Directed Verdict

■ In its first point of error, Cliffs contends the trial court erred by refusing to grant its motions for directed verdict. Cliffs made two motions for directed verdict, before and after presenting its own evidence. Longstanding, but criticized, case law holds that Cliffs' first motion was waived when it presented evidence. *Bryan v. Dockery,* 788 S.W.2d 447, 449 (Tex.App.—Houston [1st Dist.] 1990, no writ); *cf. Sipco Serv. Marine v. Wyatt Field Serv.,* 857 S.W.2d 602, 609 (Tex.App.—Houston [1st Dist.] 1993, writ dism'd) (Cohen, J.).

■ Nevertheless, Cliffs presented a second motion for directed verdict at the close of all the evidence; the second motion for directed verdict was not waived. *Horizon Properties Corp. v. Martinez,* 513 S.W.2d 264, 265 (Tex.Civ.App.—El Paso 1974, writ ref'd n.r.e.). When a second motion for directed verdict is made after the close of the evidence, the court must consider all the evidence, regardless of who offered it, to determine whether there is a fact issue for the jury. *Montgomery Ward & Co. v. Garza,* 660 S.W.2d 619, 621 (Tex.App.—Corpus Christi 1983, no writ); *Hamill v. Brashear,* 513 S.W.2d 602, 609 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.).

■ A denial of a motion for directed verdict may be reversed where the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law and there is no evidence to the contrary. *McCarley v. Hopkins,* 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ). In reviewing the denial of an instructed verdict, we consider all the evidence in the light most favorable to the nonmovant and disregard all evidence to the contrary. *Harris County v. Demny,* 886 S.W.2d 330, 333 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Every reasonable inference is resolved in favor of the nonmovant. *Id.* If there is any conflicting evidence of probative value on any theory of recovery, the issue must go to the jury. *Id.* Normally, the jury should determine whether a maritime employee has the requisite employment connection to a vessel in navigation to qualify as a member of the crew. *Chandris,* —— U.S. at ——, 115 S.Ct. at 2190.

The evidence considered in the light most favorable to Burrows shows that he was hired over the telephone by Dynamic Offshore Contractors to work directly for Cliffs.

Upon reporting to work, Burrows rode a crew boat to the MARLIN VI, which was in the Gulf of Mexico at the time. The MARLIN VI was towed through the Sabine Pass to the Texas Drydock where its legs were jacked down. Though docked, it remained in navigable waters for the durations of Burrows' employment. From July 3, 1991, until July 27, 1991, Burrows worked aboard the MARLIN VI for 11 days. While working of the MARLIN VI, Burrows was under the supervision of Doc Carlisle, a Cliffs employee. Burrows testified that he understood he was being assigned to the MARLIN VI for an indefinite period of time; he did not know whether it would last for "two weeks or two months." Gerald Abshire, a Cliffs employee, also testified that Burrows' work would last an indefinite amount of time.

Although Cliffs presented evidence that Burrows was hired for temporary repairs that would take only a few weeks, that he was to be released when the extra work was completed, and that Burrows's work would require no further time at sea, we may not consider this evidence in reviewing the trial court's denial of Cliffs' motion for directed verdict; we may only consider the evidence favorable to Burrows.

In light of the evidence detailed above, we cannot say the trial court erred by allowing the question of Burrows' connection to the vessel to go to the jury.

We overrule point of error one.

We reverse the judgment and remand the cause. On remand, the trial court should charge the jury in accordance with the definition of "seaman" set forth in *Chandris*.[4]

---

4. *Chandris* states that the court should charge the jury that the "employment-related connection to a vessel in navigation" necessary to qualify as a seaman under the Jones Act comprises two basic elements: (1) the worker's duties must contribute to the function of the vessel or to the accomplishment of its mission; and (2) the worker must have a connection to a vessel in navigation that is substantial in terms of both its duration and its nature. —— U.S. at ——, 115 S.Ct. at 2194.